UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

EDWARD WISNER DONATION ET AL.          CIVIL ACTION

VERSUS                                 NO. 14-1525

BP EXPLORATION & PRODUCTION, INC.      MAG. JUDGE WILKINSON

## ORDER AND REASONS ON MOTION

Plaintiff, the Edward Wisner Donation ("Wisner"), is a juridical entity that owns coastal Louisiana land that was both damaged and used in the response and cleanup efforts undertaken after the Deepwater Horizon explosion and oil spill in the Gulf of Mexico on April 10, 2010.  Defendant, BP Exploration & Production, Inc. ("BP"), is the adjudicated principal wrongdoer responsible for both the disaster and the cleanup.  See In re Oil Spill by Oil Rig Deepwater Horizon, 21 F. Supp. 3d 657 (E.D. La. 2014) (Barbier, J.) (Findings of Fact and Conclusions of Law, Phase One Trial, MDL No. 2179, Record Doc. No. 13381-1).

After the explosion and oil spill, Wisner and BP entered an Access Agreement dated August 23, 2010, which granted BP access to plaintiff's Fourchon Beach property "for the purpose of cleanup operations related to the [Deepwater Horizon] oil spill." Record Doc. No. 105-1, Plaintiff's Exh. 3, Access Agreement, ¶ 1.  This case is a breach of contract action arising from that agreement.

During the depositions of two BP witnesses, Dr. Duncan Fitzgerald and Laura Folse, an executive vice president for BP,  counsel for BP invoked the protections of the attorney-client privilege and work product doctrine and directed the witnesses not to answer certain questions about two sets of documents:  "(1) 12-15 reports prepared by Duncan Fitzgerald in the Spring of 2014 as well as the underlying data; and (2) three 'BP Secret' Projects/Reports . . . related to the BP [Deepwater Horizon] Oil Spill."  Record Doc. No. 105-3 at pp. 1-2.

Wisner then filed this motion to compel, Record Doc. No. 105, seeking an order requiring BP to produce these materials and permission to re-depose both witnesses and supplement its expert reports.  Buried in footnote 2 of its memorandum, Wisner apparently also seeks a ruling on whether certain documents that BP clawed back from an inadvertent production are protected from discovery.  BP responds in footnote 6 of its own memorandum that these documents are also protected from disclosure by the work product doctrine.

Having considered the voluminous written submissions of the parties, Record Doc. Nos. 105, 109, 111, 116, 118, 120-24, 121, 122, including the subject materials in camera and an exchange of letters of counsel, the record and the applicable law, the motion is DENIED for the following reasons.

2

I.      FACTUAL BACKGROUND

The following facts are gleaned from the record and the evidence submitted by the

parties.

A.      The Access Agreement

This court has already made several findings pertinent to the instant discovery

dispute.  First,

> [t]he provisions of the Access Agreement are clear.  The contract grants BP
> access to Wisner's property for BP's cleanup and response operations.  As
> accessories to that primary purpose, the contract obligates BP to protect the
> property from or pay for physical damages caused by defendant's use of its
> right of access.  It does not contain any language stating that Wisner can
> require BP to undertake certain cleanup operations. It does not say that BP
> is required to conduct oil removal operations to plaintiff's satisfaction and
> it does not contain any standards regarding such operations.  It does not
> direct BP to implement any overall remediation scheme proposed by
> Wisner.

In re Oil Spill by the Oil Rig Deepwater Horizon, No. MDL 2179, 2014 WL 4693068,

at *8 (E.D. La. Sept. 22, 2014).  Thus, the Access Agreement "obligates BP to pay for

damages caused by BP during its cleanup operations, not damages caused by oil washing

ashore from the Deepwater Horizon explosion and spill. . . .  The . . . contract has no

effect on any obligations that BP may owe to Wisner regarding damages incurred as a

result of the oil released."  Id. at *10 (citing several provisions of the Access Agreement,

especially ¶ 9); see Plaintiff's Exh. 3, Access Agreement, ¶ 9 ("Grantee [BP] shall be

responsible for all reasonable costs and expenses associated with assessing damage to

Wisner property caused by oil spill cleanup operations.  Grantee shall be responsible for all reasonable costs and expenses associated with restoring said damage to said property.").

> Second, the Access Agreement states that
>
> Grantee [BP] will provide Grantor [Wisner] with a copy of all waste manifests or other documents detailing all materials removed from the Wisner Donation Property, the results of all testing of any kind carried out on Grantor's Property by Grantee's contractors or at grantee's request in connection with operations, and all <u>documentary information such as</u> photographs, video, GPS logs, <u>reports</u>, work logs or journals, <u>kept in connection with SCAT [Shoreline Cleanup and Assessment Technique] assessments and oil removal operations</u>.  This information will be provided as received on a weekly basis.

Plaintiff's Exh. 3, Access Agreement, ¶ 6 (emphasis added).

> Finally,
>
> the Access Agreement contains no duration provision, rendering it terminable at will by either party.  On May 22, 2014, BP notified Wisner that it would no longer need to access the property because the Federal On-Scene Coordinator had "concluded that 'no further removal activities are appropriate on the property.'" . . . .  BP also advised Wisner that it would continue to provide all information and reimbursements required under the Access Agreement as of the date of the letter, but that the contract was otherwise terminated.  This notice of termination could not be a breach of the contract.

<u>In re Oil Spill by the Oil Rig Deepwater Horizon</u>, 2014 WL 4693068, at *11.

> B.     <u>The Litigation</u>

Shortly after the Access Agreement was entered, Wisner began to complain to BP that BP was violating its contractual obligations.  For example, Wisner sent a letter to

BP's counsel on November 9, 2010, asserting that BP had breached the Access Agreement "in almost every . . . respect" and outlining numerous specific breaches. Letter dated November 9, 2010, Attachment B to the declaration under penalty of perjury of C. Cathy Norman, filed in C.A. No. 10-2771, Record Doc. No. 5751-3 at pp. 26-29.

Wisner formally filed its claims against BP for breach of the Access Agreement and other alleged damages on April 19, 2011, as a cross-claim in Civil Action No. 10-2771 in this court.  That case was consolidated with the Deepwater Horizon multi-district litigation.  MDL No. 2179, Record Doc. No. 326, ¶¶ 37-44, 56-60, 64-70, 72-73.  Wisner asserted the same breach of contract claims in that prior action as it asserts in the instant case.

On June 6, 2014, Wisner filed an "Expedited Motion for Specific Performance" in MDL member case No. 13-1971, alleging that BP had "rejected numerous assessment and remediation demands" that Wisner had made under the Access Agreement.  MDL No. 2179, Record Doc. No. 13002-1 at p. 7.  However, the motion was improperly filed in C.A. No. 13-1971, which is Wisner's action against BP and other operators of the Deepwater Horizon oil well and platform for damages pursuant to general maritime law and the Oil Pollution Act, 33 U.S.C. § 2701, and did not include any claims under the Access Agreement.  Plaintiff filed the captioned case on July 1, 2014, so that its distinct claims under the Access Agreement could be severed from and proceed independently of its claims against BP for violations of the Oil Pollution Act, Clean Water Act, federal

general maritime law and Louisiana state law in C.A. No. 10-2771 and other cases that remain pending as part of MDL No. 2179.

The court ordered Wisner either to dismiss the motion for specific performance without prejudice voluntarily (so that it could be filed properly in the instant case) or advise the court that it would pursue the motion in C.A. No. 13-1971.  Record Doc. No. 9 in C.A. No. 14-1525.  At Wisner's request, the court dismissed the motion.  Record Doc. No. 13160 in MDL No. 2179.  On July 17, 2014, Wisner filed a Motion for Preliminary Injunction in the instant case, making the same allegations and seeking the same relief pursuant to the Access Agreement as  it had in its prior motion for specific performance. Record Doc. No. 13152 in MDL No. 2179.  The motion for preliminary injunction was denied.  Record Doc. No. 13425 in MDL No. 2179; Record Doc. No. 18 in C.A. No. 14-1525.

C.    The Fitzgerald Reports

Dr. Fitzgerald is a Professor of Geology at Boston University.  Plaintiff's Exh. 1, deposition of Dr. Duncan Fitzgerald, at 13-14.  His association and role with BP in connection with the Deepwater Horizon incident evolved over time.  In May 2010, Dr. Fitzgerald joined the oil spill response as a SCAT Team Lead, working for Polaris, a BP contractor.  Id. at 17-18.  A few months later, he became a SCAT Team Adviser with enlarged responsibilities, still working for Polaris.  Id. at 22-23, 38.  BP has identified Dr.

Fitzgerald as a fact, but not an expert, witness in the instant action. Defendant's Preliminary Witness and Exhibit List, Record Doc. No. 99.

Some time in 2012, Dr. Fitzgerald met as a fact witness with attorney Emma Lewis of Arnold & Porter law firm, who represented BP. Plaintiff's Exh. 1, Fitzgerald deposition at 19, 35. It is not entirely clear from Dr. Fitzgerald's testimony, but plaintiff alleges in its motion and BP does not dispute that at some point after that meeting, Dr. Fitzgerald was no longer employed by Polaris, but was under an employment contract with Arnold & Porter. See id. at 18-19, 84-87; Defendant's Exh. A, declaration of Gary Hayward, BP's Environmental Section Chief for the oil spill response, ¶ 11. However, Dr. Fitzgerald's job duties as a SCAT Team Adviser did not change after his meeting with Lewis in 2012. Plaintiff's Exh. 1, Dr. Fitzgerald deposition, at 27-28.

BP removed Dr. Fitzgerald from doing field work around October 16, 2013, but he continued to do occasional work for Polaris. Id. at 279, 283-84, 297. According to Dr. Fitzgerald: (1) he began doing privileged work for BP through Lewis's law office in January 2014, and all of his work after that date was privileged. Id. at 85, 296-97. (2) None of the work that he did for BP concerning Fourchon Beach before January 2014 was privileged. Id. at 88. (3) The work he did for BP beginning in January 2014 differed from the work he had done before that date. Id. at 381.

Between September 2012 and mid-February 2015, Gary Hayward was BP's Environmental Section Chief for the oil spill response and served on the Unified

Command's[1] Gulf Coast Incident Management Team until SCAT and Incident Management Team activities ceased in mid-February 2015.  Defendant's Exh. A, Gary Hayward declaration, ¶ 2.  On December 11, 2013, Nathan Block, Senior Counsel for BP's Gulf Coast Restoration Organization, asked Hayward to produce a report concerning the oil spill response activities and conditions at Fourchon Beach (the "Fourchon Beach Project"), which includes the Wisner property.  Id. ¶ 4; Defendant's Exh. B, declaration of Nathan Block, ¶¶ 21-23; Exh. 1 to Defendant's Exh. B, Block declaration (Exhibit 1 to Block's declaration is an e-mail from him dated December 11, 2013, which BP filed under seal on the basis of attorney-client privilege); Plaintiff's Exh. 1, Fitzgerald deposition at 90.  Block informed Hayward that the work would be performed in support of litigation, that he expected activity in the pending litigation to accelerate upon occurrence of certain specified events and that the requested work was needed to address expected litigation challenges.  Exh. 1 to Defendant's Exh. B, Block declaration.  Block instructed Hayward that he could delegate tasks to others and to keep

---

[1]The United States Coast Guard, an agency of the Department of Homeland Security, has jurisdiction over all incidents in federal waters and is charged with directing offshore oil spill responses. Florida Commission on Oil Spill Response Coordination, "Report 2: An Analysis of the Effectiveness of the Use of the Incident Command System in the Deepwater Horizon (DWH) Incident," at 17 (Nov. 2, 2012), https://www.dep.state.fl.us/deepwaterhorizon/files2/corc/Incident_Command_System.pdf.  The Incident Command Structure "provides a framework for how incidents are managed across all homeland security activities, including prevention, protection, response, mitigation and recovery."  Id. at 1.  In the case of a multi-jurisdictional incident, a Federal On-Scene Coordinator may establish a Unified Area Command to coordinate the response efforts of all agencies and jurisdictions.  Id. at 7.  The Federal On-Scene Coordinator, who in Louisiana was a Coast Guard Commander in this instance, is assisted by "an Incident Commander from each affected state, tribe, local community, and responsible party.  Other federal agencies may act in an advisory position to the Unified Commander."  Id. at 21.

the work separate from any work performed as part of the oil spill response.  Id.; Defendant's Exh. A, Hayward declaration, ¶¶ 5-7.

On or around December 19, 2013, Hayward sent a draft outline for the project to Block and William "Danny" Wallace (BP's Incident Commander within the Unified Command), and asked to obtain Dr. Fitzgerald's assistance to complete the Fourchon Beach Project.  Id., ¶ 9; Defendant's Exh. B, Block declaration, ¶ 24.  Hayward had previously worked with Dr. Fitzgerald and believed that Dr. Fitzgerald's expertise would be relevant to this project.  Defendant's Exh. A, Hayward declaration, ¶ 10.  Block approved Hayward's request to engage Dr. Fitzgerald.  Id. ¶ 9.

Some time between December 19 and 31, 2013, Hayward asked Dr. Fitzgerald to co-author reports for the Fourchon Beach Project ("the Fitzgerald Reports"), which Dr. Fitzgerald understood to be "privileged."  Id., ¶ 11; Plaintiff's Exh. 1, Fitzgerald deposition at 84-85, 96, 367.  Hayward informed Dr. Fitzgerald that the Fitzgerald Reports were being prepared at Block's request to support anticipated litigation.  Id. at 96-97, 135; Defendant's Exh. A, Hayward declaration, ¶ 12.  Dr. Fitzgerald understood that the purpose of this work was to educate lawyers representing BP in future litigation, that Wisner and BP were already involved in a lawsuit and that the reports would be provided to BP's current attorneys.  Plaintiff's Exh. 1, Fitzgerald deposition at 367-68. As outlined above, Wisner's breach of contract claims against BP were pending at that time in C.A. No. 10-2771, a member case in the MDL, as were plaintiff's claims against

BP for damages under the Oil Pollution Act, Clean Water Act, federal general maritime law and Louisiana state law in that case.

Beginning in January 2014, Dr. Fitzgerald co-authored with Hayward and Shannon MacDonald, another Polaris contract employee, what Dr. Fitzgerald "guess[ed]" were between 12 and 15 reports.  Id. at 84-85, 95, 367.  Hayward had engaged MacDonald to work with him and Dr. Fitzgerald at an unspecified time before February 11, 2014 (when she was participating in an e-mail conversation about the project, Bates No. Wisner_112629 in the clawed-back documents provided to the court), and had instructed MacDonald similarly about the purpose and privileged nature of the project. Defendant's Exh. A, Hayward declaration, ¶ 13.  Doug Reimer, who also worked for Polaris, provided the co-authors with requested photographs.  Other BP personnel assisted with data development for the reports.  Id.

The Fitzgerald Reports contain the authors' "[c]onsiderable analysis" of data related to oiling conditions, SCAT surveys, response operations and environmental conditions, and their conclusions based on the data.  Plaintiff's Exh. 1, Fitzgerald deposition at 368, 382; Defendant's Exh. A, Hayward declaration, ¶ 14.  The only work that Dr. Fitzgerald did for BP in 2014 was to prepare these reports.  Plaintiff's Exh. 1, Fitzgerald deposition at 296-97.  He sent the reports only to Hayward.  Id. at 86, 94.

The data underlying the Fitzgerald Reports is both Unified Command data generated during the oil spill response and publicly available data.  Defendant's Exh. A,

Hayward declaration, ¶ 14; Defendant's Exh. B, Block declaration, ¶ 26.  No field work or additional data gathering was conducted to generate these reports.  Defendant's Exh. A, Hayward declaration, ¶ 14.  The Unified Command data includes SCAT surveys, SCAT photographs and data relating to oiling conditions, oil spill response operations and environmental conditions.  Id.  According to BP, it has already provided Wisner with all of the non-public data underlying the Fitzgerald Reports, pursuant to its obligations under the Access Agreement and in discovery related to this litigation.  Id.; Defendant's Exh. B, Block declaration, ¶ 26.

The Fitzgerald Reports concern the location of oil on the Wisner property, but do not concern whether to remove any oil from the property or whether any damage was done to the property by response or cleanup efforts.  Plaintiff's Exh. 1, Fitzgerald deposition, at 135-36, 382.  Dr. Fitzgerald, Hayward and McDonald continued to revise and refine the reports until February 2015, when they delivered the final versions to Block.  Defendant's Exh. A, Hayward declaration, ¶¶ 13, 15.  These reports had by then become known as the "Operations Reports."  Id.  According to Block, the Operations Reports have not been used for any purpose other than to support litigation and have not been shared beyond the lawyers directly involved in litigation between BP and Wisner.  Defendant's Exh. B, Block declaration, ¶ 27.

Wisner argues in this motion that the Fitzgerald Reports are not protected work product because they were created in BP's ordinary course of business of responding to

11

the Deepwater Horizon oil spill.  Specifically, Wisner contends that Dr. Fitzgerald's ordinary work from 2010 through 2013 was to write reports for BP and that he merely continued in this same function in 2014.  Wisner also argues that, even if the Fitzgerald Reports are work product, it has substantial need for the materials to prepare its case and that it cannot, without undue hardship, obtain the substantial equivalent of the materials by other means.  Plaintiff further contends that the Access Agreement requires BP to produce the Fitzgerald Reports and the underlying data to Wisner.  BP responds that the Fitzgerald Reports are protected from discovery by the work product doctrine and that plaintiff's motion to compel production of the data underlying the reports should be dismissed as moot because Wisner already has access to all of the data.

C.  "BP Secret" Projects

Folse has been Executive Vice President of BP's Gulf Coast Restoration Organization since mid-2012.  Plaintiff's Exh. 7, Laura Folse deposition, at 10, 12. During her deposition, Wisner counsel attempted to elicit testimony regarding three projects that defendant had classified internally as "BP Secret."  Folse testified that this classification is used only for "[d]ocuments that are thought to potentially be of such a nature that they could have a significant impact on the share price.  I don't know that that's the exact designation, but it could have a material impact on the company.  And the designation is very infrequently used."  Id. at 73.  Counsel for BP instructed Folse not

to answer questions that would reveal information about these projects that was protected by the attorney-client privilege and/or the work product doctrine.  Id. at 74-76.

Project 1 (the project numbers are those identified by Folse in her deposition)[2] was an attorney-directed effort to evaluate certain information and obtain legal advice for the purpose of settlement negotiations with the Gulf Coast states that began in the spring of 2011 and ended around the end of 2011.  Id. at 83, 86-87, 110-12, 114; Defendant's Exh. B, Block declaration, ¶¶ 7, 14.  The "reports" created during the course of Project 1 were attorney-drafted memoranda conveying legal advice to BP and an analysis performed at the direction of counsel.  Id., ¶¶ 10-14.

Project 2 was an attorney-directed effort to evaluate the potential litigation and resolution of Natural Resource Damages claims by federal and state agencies arising from the Deepwater Horizon incident.  The settlement evaluation and negotiations began in 2010 shortly after the oil spill and were ongoing at the time of Folse's deposition in September 2015.  Plaintiff's Exh. 7, Folse deposition at 111, 117; Defendant's Exh. D, declaration of attorney Matthew J. Douglas of Arnold & Porter law firm, ¶ 3.  BP has agreed in principle to settle all federal and state claims for Natural Resource Damages.

> The settlement is incorporated into a Consent Decree that was lodged on October 5, 2015 with the Court in MDL 2179, in the Eastern District of Louisiana, for public comment. . . . [A] confidentiality restriction [in MDL 2179] . . . requires the parties to "keep settlement negotiations, communications and term sheets, other than the final settlement documents,

---

[2]In its motion, Wisner transposed the numbers for Projects 2 and 3.

as private, and disclose to no one."  See MDL 2179 Pre-trial Order 38, Rec.
Doc. 3201, amended by Rec. Docs. 14801, 14806 and 15434.

Id., ¶ 15.

Project 2 was conducted under the direction of attorneys from BP and Arnold &
Porter.  Retained experts working at the direction of legal counsel performed the
evaluation in conjunction with counsel. Id. ¶¶ 4-11.  The goal of Project 2 was to inform
the evaluation of Natural Resource Damages claims by federal and state agencies arising
from the Deepwater Horizon incident and to provide legal advice to BP regarding
potential litigation and resolution of the government agency claims.  Id. ¶ 3.

Project 3 was an internal project to evaluate "big picture" options for managing
the ongoing spill response, none of which concerned the assessment of oil on Wisner
property.  Plaintiff's Exh. 7, Folse deposition at 120-121, 123; Defendant's Exh. B,
Block Decl. ¶ 15.  Block became the third core member of the project team before any
analysis began.  Id.  The substantive work product created pursuant to Project 3 was
created at Block's direction.  Much of the work product was created to communicate his
legal advice or the advice of outside counsel to BP.  Defendant's Exh. B, Block
declaration, ¶ 17.

II.    LEGAL STANDARDS

   A.    The Scope of Discovery

Parties may obtain discovery regarding any nonprivileged matter that is
relevant to any party's claim or defense–including the existence,

14

> description, nature, custody, condition, and location of any documents or
> other tangible things and the identity and location of persons who know of
> any discoverable matter. For good cause, the court may order discovery of
> any matter relevant to the subject matter involved in the action. Relevant
> information need not be admissible at the trial if the discovery appears
> reasonably calculated to lead to the discovery of admissible evidence. All
> discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(1). Materials outside this scope need not be produced because

"only relevant matter . . . may be the subject of discovery." C. Wright, A. Miller, M.

Kane, R. Marcus & A. Steinman, 8 Federal Practice & Procedure § 2008 (3d ed.)

(available on Westlaw at FPP 2008) (hereinafter "Wright & Miller").

### B.   The Attorney-Client Privilege

BP asserts that any reports from the three projects it classified internally as BP

Secret are protected from discovery by the attorney-client privilege. As the party

resisting discovery, defendant bears the burden of proof to demonstrate the existence of

both the attorney-client privilege and work product protection in the materials it has

withheld. United States v. Newell, 315 F.3d 510, 525 (5th Cir. 2002); In re Santa Fe Int'l

Corp., 272 F.3d 705, 710 (5th Cir. 2001); Hodges, Grant & Kaufman v. United States,

768 F.2d 719, 721 (5th Cir. 1985); Chevron Midstream Pipelines LLC v. Settoon Towing

LLC, No. 13-2809, 2015 WL 65357, at *6 (E.D. La. Jan. 5, 2015); Ingraham v. Planet

Beach Franchising Corp., No. 07-3555, 2009 WL 1076717, at *1 (E.D. La. Apr. 17,

2009); Maldonado v. Kiewit La. Co., 152 So.3d 909, 927 (La. App. 1st Cir. 2014). This

is an evidentiary burden. Therefore, BP has submitted the declarations of its Executive

Vice President Folse, Environmental Section Chief Hayward and attorneys Block and Douglas.

Louisiana evidence law governs privilege questions in this breach of contract action brought under Louisiana substantive law. Fed. R. Evid. 501; Exxon Mobil Corp. v. Hill, 751 F.3d 379, 381 (5th Cir. 2014); Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 299 n.26 (5th Cir. 2005). However, federal common law and Louisiana statutory law are materially similar concerning the attorney-client privilege. Hodges, Grant & Kaufman, 768 F.2d at 720-21; Soriano v. Treasure Chest Casino, Inc., No. 95-3945, 1996 WL 736962, at *2 (E.D. La. Dec. 23, 1996).

Louisiana's Code of Evidence provides that a "client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client." La. Code Evid. art. 506(B) (emphasis added). A communication is confidential "if it is not intended to be disclosed to persons other than: . . . [t]hose to whom disclosure is made in furtherance of obtaining or rendering professional legal services for the client." Id. art. 506(A)(5)(a).

The privilege attaches to confidential communications that are

(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.
(2) Between the lawyer and a representative of the lawyer.
. . . .

16

(4) Between representatives of the client or between the client and a representative of the client.

Id. art. 506(B).

A "representative of the client" is defined as:

(a) A person having authority to obtain professional legal services, or to act on advice so obtained, on behalf of the client.
(b) Any other person who makes or receives a confidential communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client.

Id. art. 506(A)(2). A "representative of the lawyer" is defined as "a person engaged by the lawyer to assist the lawyer in the lawyer's rendition of professional legal services."

Id. art. 506(A)(4).

"A corporate client has a privilege to refuse to disclose, and prevent its attorneys from disclosing, confidential communications between its representatives and its attorneys when the communications were made to obtain legal services." Nguyen v. Excel Corp., 197 F.3d 200, 206 (5th Cir. 1999). In a corporation, "communications from lower echelon employees [are] within the privilege as long as the communications were made to the attorney to assist him in giving legal advice to the client corporation." United States v. El Paso Co., 682 F.2d 530, 538 n.8 (5th Cir. 1982) (citing Upjohn Co. v. United States, 449 U.S. 383, 391-92 (1981)).

Although the attorney-client privilege applies in a corporate setting, the courts have noted that it is more difficult to define the scope of the privilege when the communication is made to in-house counsel because in-house counsel has an increased level of participation in the day to day

operations of the corporation.  <u>The attorney-client privilege attaches only to communications made for the purpose of giving or obtaining legal advice, not business or technical advice</u>.  Additionally, in Louisiana, the attorney-client privilege does not protect all information obtained by an attorney because of his position as a legal advisor.

<u>Brookshire Bros. Holding, Inc. v. Total Containment, Inc.</u>, 2:04-CV-1150, 2006 WL 845731, at *2 (W.D. La. Mar. 30, 2006) (emphasis added) (citing La. Code Evid. arts. 506(B), 509; <u>Upjohn Co.</u>, 449 U.S. at 390; <u>Commodity Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 348 (1985); <u>Guy v. United Healthcare Corp.</u>, 154 F.R.D. 172, 177 (S.D. Ohio 1993)) (additional citations omitted).

"[W]hat is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer."  <u>El Paso Co.</u>, 682 F.2d at 538 (quotation omitted); <u>accord</u> <u>State v. Montgomery</u>, 499 So. 2d 709, 712 (La. App. 3d Cir. 1986).  "Context here is key," and the resolution of privilege questions turns on the facts and evidence in a particular case.  <u>Exxon Mobil Corp.</u>, 751 F.3d at 382.  "[I]t is axiomatic that the attorney-client privilege only protects disclosure of confidential communications between the client and his attorney; it does not protect underlying facts."  <u>Consol. Health Plans, Inc. v. Principal Performance Group, Inc.</u>, No. 02-1230, 2003 WL 1193663, at *5 (E.D. La. Mar. 14, 2003) (citing <u>United States v. Edwards</u>, 39 F. Supp. 2d 716, 735 (M.D. La.1999); <u>Boyd v. St. Paul Fire & Marine Ins. Co.</u>, 775 So. 2d 649, 655 (La. App. 3d Cir. 2000)) (quotation omitted); <u>accord</u> <u>Succ'n of Smith v. Kavanaugh, Pierson & Talley</u>, 513 So. 2d 1138, 1150 (La. 1987).

Thus, BP, as the party asserting the privilege under Louisiana law, bears an evidentiary burden to establish:

> 1) the holder of the privilege is or sought to become a client; 2) the communication was made to an attorney or his subordinate in a professional capacity; 3) the communication was made outside the presence of strangers; 4) the communication was made for the purpose of obtaining a legal opinion or services; and 5) the privilege has not been waived.

Maldonado, 152 So. 3d at 927 (citing In re Shell Oil Ref., 812 F. Supp. 658, 661 (E.D. La.1993); Cacamo v. Liberty Mut. Fire Ins. Co., 798 So. 2d 1210, 1216 (La. App. 4th Cir. 2001)).

Wisner does not dispute that BP is the client or that the communications at issue were made outside the presence of strangers.  It argues, however, that all of the allegedly privileged reports were created in the ordinary course of BP's business of responding to the oil spill and not to obtain a legal opinion or services.  Wisner also contends that BP is obligated by the Access Agreement to provide plaintiff with these materials, which Wisner characterizes as "documentary information such as . . . reports . . . kept in connection with SCAT assessments and oil removal operations" on its property. Plaintiff's Exh. 3, Access Agreement, ¶ 6.

C.     The Work Product Doctrine

BP argues that the Fitzgerald Reports, the related clawed-back materials and the BP Secret Projects reports are protected from discovery by the work product doctrine. Whether this protection applies is a question of federal law.  Baker v. Gen. Motors Corp.,

209 F.3d 1051, 1053 (8th Cir. 2000); Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 875 (5th Cir. 1991); Williams v. Connick, No. 12-1274, 2014 WL 6698299, at *8 (E.D. La. Nov. 26, 2014).

Work product protection extends to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for [a] party or its representative (including the . . . party's attorney, consultant, . . . or agent)," Fed. R. Civ. P. 26(b)(3)(A), but does not extend to "underlying relevant facts." Blockbuster Entm't Corp. v. McComb Video, Inc., 145 F.R.D. 402, 403 (M.D. La. 1992) (citing El Paso Co., 682 F.2d at 542; Hill Tower, Inc. v. Dep't of Navy, 718 F. Supp. 562, 566 (N.D. Tex. 1988)); accord 8 Wright & Miller, § 2024 at 494 (available on Westlaw at FPP 2024).  The work product "privilege can apply where litigation is not imminent, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." Udoewa v. Plus4 Credit Union, 457 F. App'x 391, 393 (5th Cir. 2012) (quoting In re Kaiser Alum. & Chem. Co., 214 F.3d 586, 593 (5th Cir. 2000)) (internal quotation omitted) (emphasis added).

"The mere fact that a document is prepared when litigation is foreseeable does not mean the document was prepared in anticipation of litigation . . . ." Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., 19 F.3d 1432, 1994 WL 58999, at *3 (6th Cir. 1994) (citing Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992)).  Even "[e]stablishing that a document was prepared after litigation was

commenced is insufficient to prove that the document was prepared in anticipation of litigation. . . .  What is crucial is that 'the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'"  Robinson v. Tex. Auto. Dealers Ass'n, 214 F.R.D. 432, 449 (E.D. Tex. 2003) (quoting In re Kaiser Alum., 214 F.3d at 593), rev'd on other grounds, 2003 WL 21911333 (5th Cir. July 25, 2003); accord Global Oil Tools, Inc. v. Barnhill, No. 12-1507, 2013 WL 1344622, at *6 (E.D. La. Apr. 3, 2013); Guzzino v. Felterman, 174 F.R.D. 59, 63 (W.D. La. 1997); Blockbuster, 145 F.R.D. at 404.

The work product doctrine "unquestionably" protects reports prepared by consulting experts in anticipation of litigation.  Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989).  It protects materials prepared by parties, their attorneys and their agents because "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation of trial."  United States v. Nobles, 422 U.S. 225, 238-39 (1975); accord Clopton v. Animal Health Int'l, Inc., No. A-13-CV-205-LY, 2014 WL 6964537, at *2 (W.D. Tex. Dec. 8, 2014) (citing Nobles, 422 U.S. at 238-39); LaSalle Bank N.A. v. Mobile Hotel Props., LLC, No. 03-2225, 2004 WL 902169, at *6 (E.D. La. Apr. 23, 2004) (citing Nobles, 422 U.S. at 238-39).

In addition, "[t]he law is settled that 'excluded from the work product doctrine are materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'"  Guzzino, 174 F.R.D. at 62 (quoting El Paso Co.,

21

682 F.3d at 542 (citing Fed. R. Civ. P. 26(b)(3) advisory committee notes)); accord 8

Wright & Miller, Federal Practice and Procedure § 2024, at 503 (3d ed. 2010); see also

Hill Tower, Inc., 718 F. Supp. at 565 ("The mere fact this report deals with facts,

opinions, and recommendations that later may be the focus of litigation does not establish

that there was the expectation of litigation when this document was drafted.") (citing

Senate of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 586 (D.C. Cir. 1987); Coastal

States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 865 (D.C. Cir. 1980)).  Thus, "[i]f

the document would have been created regardless of whether the litigation was also

expected to ensue, the document is deemed to be created in the ordinary course of

business and not in anticipation of litigation."  Global Oil Tools, 2013 WL 1344622,

at *6 (citing S. Scrap Mat'l Co. v. Fleming, 2003 WL 21474516, at *6 (E.D. La. June 18,

2003); Piatkowski v. Abdon Callais Offshore, L.L.C., No. 99-3759, 2000 WL 1145825,

at *1 (E.D. La. Aug, 11, 2000)); accord Chevron Midstream Pipelines LLC, 2015 WL

65357, at *7.

     If the party claiming work product protection carries its burden to establish that

the materials were created in anticipation of litigation and are work product, the party

who seeks the discovery then must bear its own evidentiary burden to show both that it

has substantial need for the materials to prepare its case and that it cannot, without undue

hardship, obtain the substantial equivalent of the materials by other means.  Hunkin v.

Cooper/T. Smith Stevedoring Co., No. 08-456, 2010 WL 93856, at *2 (W.D. La. Jan. 7,

2010) (citing Fed. R. Civ. P. 26(b)(3); <u>In re Int'l Sys. & Controls Corp. Secs. Litig.</u>, 693 F.2d 1235, 1240 (5th Cir. 1982); <u>Hodges, Grant & Kaufman</u>, 768 F.2d at 721); <u>accord</u> <u>Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.</u>, 219 F.R.D. 396, 400 (E.D. Tex. 2003) (citing same cases). Even if the discovering party is able to meet that burden, opinion work product merits special protection from discovery pursuant to Rule 26(b)(3)(B). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." <u>Nobles</u>, 422 U.S. at 238-39.

> [W]hen a party is ordered to produce its work product because the discovering party has made the showing mandated by Rule 26(b)(3)(A)(i) and (ii), Rule 26(b)(3)(B) requires the court to "protect against disclosure of the <u>mental impressions, conclusions, opinions, or legal theories</u> of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B) (emphasis added). Thus, tangible materials that contain the mental impressions, conclusions, opinions or legal theories of a party's attorney or representative, otherwise known as "opinion work product," are afforded a high degree of protection.

<u>In re Katrina Canal Breaches Consol. Litig.</u>, No. 05-4182, 2010 WL 2522968, at *1 (E.D. La. June 14, 2010) (citing <u>Dunn</u>, 927 F.2d at 875; <u>Int'l Sys. & Controls Corp.</u>, 693 F.2d at 1240; <u>Bross v. Chevron U.S.A. Inc.</u>, No. 06-1523, 2009 WL 854446, at *5 (W.D. La. Mar. 25, 2009)).

III.   ANALYSIS

A.   The BP Secret Projects

Wisner contends that "BP engaged in reports and collections of materials that pertain to the Wisner Property but have not been produced" and that the "BP Secret Projects likely contain data and information that (a) pertain to the Wisner Property and (b) can not be obtained elsewhere."  Plaintiff's memorandum, Record Doc. No. 105-3 at 14.  Plaintiff contends, and BP apparently admits, that the records kept for oiled material removed from Louisiana, Fourchon and the Wisner Property from May 2010 through June 2011 were not maintained in a manner that allows a reliable estimate of the total volume.  BP's reports on this subject only date back to June 2011.[3]  Wisner asserts that an element of its "damages is the volume of oiled material removed from its Property that should have been replaced with clean, comparable sand.  In order to properly quantify the amount of this element of damage, Wisner needs to know how much oiled material was removed from its property from May 2010-June 2011."  Id.  Plaintiff argues that it is entitled to such information under the Access Agreement.

BP first responds that materials related to the three Secret Projects are not relevant to Wisner's claims or BP's defenses in the instant lawsuit and thus exceed the scope of

_____

[3]BP states in its opposition memorandum that it "is in the final stages of" "locating and producing additional waste manifests" from this time period "and will complete its supplemental production promptly."  Defendant's memorandum, Record Doc. No. 122 at 11 n.5.  Although Wisner has not moved to compel production of these documents in the instant motion, IT IS ORDERED that BP must complete this supplementation no later than November 30, 2015.  Fed. R. Civ. P. 26(e)(i)(B).

discovery.  Because defendant contends that the materials are not responsive to any of plaintiff's discovery requests, BP never listed the materials on its privilege log.  The three Secret Projects came up during Folse's deposition.  Wisner then demanded production of documents from those projects related to its property.

My review of the documents from Secret Projects 1, 2 and 3 provided by BP for in camera review and of the unredacted declarations of Folse, Block and Douglas (filed under seal) confirms BP's contention that the materials are irrelevant.  None of the Secret Projects addressed or involved plaintiff's claims or BP's defenses with respect to BP's contractual obligations or Wisner's alleged damages in the instant case.  Projects 1 and 2 were attorney-directed efforts to evaluate information and obtain legal advice for the purpose of settlement negotiations with third parties with whom BP was involved in pending or anticipated litigation.  Project 3 was an internal project to evaluate "big picture" options for managing the ongoing spill response, none of which concerned the assessment of oil on Wisner's property.

Because the materials related to these projects are not relevant to the parties' claims or defenses in the instant lawsuit, the materials are not within the scope of discovery.  Even assuming that the materials could relate to "any matter relevant to the subject matter involved in the action," Wisner has not shown good cause to expand the scope of discovery to such matters, as Fed. R. Civ. P. P. 26(b)(1) requires.

In addition, Projects 1 and 2 clearly encompass both attorney-client privileged communications and work product prepared in anticipation of or for use in litigation with parties unrelated to Wisner.   A lawyer's evaluation of a client's and its opponent's positions with respect to expected or ongoing settlement negotiations encompass both attorney-client privileged communications and attorney work product.  <u>Software Tree, LLC v. Red Hat, Inc.</u>, No. 6:09-CV-097, 2010 WL 2788202, at *4 (E.D. Tex. June 24, 2010); <u>Gen. Elec. Co. v. Johnson</u>, No. 00-2855(JDB), 2006 WL 2616187, at *11 (D.D.C. Sept. 12, 2006); <u>Riddell Sports, Inc. v. Brooks</u>, No. 92 Civ. 7851 (PKL), 1995 WL 20260, at *1 (S.D.N.Y. Jan. 12, 2004); <u>United States v. Mobil Corp.</u>, 149 F.R.D. 533, 539 (N.D. Tex. 1993).

The documents provided for in camera review from Project 3 are less clearly covered by the attorney-client privilege and the work product doctrine.  The documents include both legal and business considerations.  BP's attorney Block became one of the three team leaders on Project 3 before any substantive work was done.  He directed the drafting of the documents for confidential presentation to executive management.  The materials are marked "Privileged Attorney Work Product" with instructions not to disseminate them to anyone outside the project team.  As Block stated in his declaration, this project was intertwined with numerous legal issues.  Defendant's Exh. B, Block Decl. ¶ 16.  His sealed declaration explains the issues on which he and outside counsel provided substantial legal advice to enable executives to make business decisions.  The

legal issues included regulatory issues, pending or anticipated litigation and settlement negotiations with respect to the oil spill, and contractual arrangements (not including BP's contract with Wisner).

Although it appears that many of the communications reflected in Project 3 were made in confidence for the purpose of obtaining legal advice from the lawyer and/or were prepared under Block's supervision with respect to pending and/or anticipated litigation (but not litigation with Wisner), I cannot find that the entire documents are covered by either the attorney-client or the work product privilege. Nonetheless, because the Project 3 materials are clearly irrelevant to this litigation, with claims and defenses limited to the Access Agreement and not extending to the entire legal and business morass resulting from the Deepwater Horizon incident, I will not order production of the Project 3 materials, even in redacted form to exclude privileged statements.

Wisner argues that BP should not be "allow[ed] to hide behind privilege." Plaintiff's reply memorandum, Record Doc. No. 121 at 2. This is erroneous. Unlike the work product doctrine, the attorney-client privilege requires no balancing of the parties' interests. That has already been accomplished by the policies and rationales underpinning this important privilege. 1 McCormick on Evidence § 87 (7th ed.) (available on Westlaw; database updated March 2013). The attorney-client privilege "reflects society's judgment that promotion of trust and honesty within the relationship is more important than the burden placed on the discovery of truth." Coastal States Gas Corp., 617 F.2d at 862

(citing <u>McCormick on Evidence</u> § 87 at 175 (2d ed. 1972)); <u>see</u> <u>McCormick on Evidence</u> § 87 (7th ed.) ("The consequent loss to justice of the power to bring all pertinent facts before the court is . . . outweighed by the benefits to justice (not to the individual client) of a franker disclosure in the lawyer's office.").  Wisner may not discover BP's attorney-client privileged communications, regardless of any relevance of the materials or plaintiff's alleged need for them.  BP has supported its privilege assertion with more than adequate evidence and the court upholds it in the interests of protecting "a client's legal rights, and . . . the proper functioning of the adversary process."  <u>Coastal States Gas Corp.</u>, 617 F.2d at 862.

As to defendant's protected work product in Secret Projects 1, 2 and 3, Wisner has <u>not</u> satisfied its burden to show that it has substantial need for the materials to prepare its case.  Wisner cannot have substantial need of documents that are irrelevant to its claims and BP's defenses in <u>this</u> litigation.

Wisner also argues that the Access Agreement obligates BP to provide plaintiff with the reports from Secret Projects 1, 2 and 3.  The Access Agreement provides that BP must provide Wisner with "all documentary information such as photographs, video, GPS logs, reports, work logs or journals, kept in connection with SCAT assessments and oil removal operations [on Wisner's property]."  Plaintiff's Exh. 3, Access Agreement, ¶ 6.  Even if this language could be construed as some sort of strained, prospective waiver of defendant's attorney-client privilege or work product protection in materials

within its scope (which Wisner does not support with any authority and which I do not find), the materials related to Projects 1, 2 and 3 that I have reviewed in camera are <u>not</u> within the scope of this language.

Rather than being documentary information kept in connection with SCAT assessments and oil removal operations on Wisner's property, the Secret Project materials were created and maintained entirely separately from the operations reports and data to provide information and advice to BP executives for well-defined purposes.  In Secret Projects 1 and 2, those purposes were anticipated or pending litigation and settlement negotiations with third parties unrelated to plaintiff's property or the Access Agreement.  The purpose of Secret Project 3 was to evaluate "big picture" strategies for managing the oil spill response as a whole.  At best, this was tangentially related to plaintiff's property to the extent that removal operations on its property were part of the overall spill response, but both the purpose and the documents in Secret Project 3 are entirely unrelated to Wisner's claims or BP's defenses for breach of contract in this action.  The unambiguous Access Agreement, interpreted as a whole in light of its context and purposes, <u>Chevron USA Inc. v. Santa Fe Snyder</u>, 69 F. App'x 658, 2003 WL 21355979, at *2 (5th Cir. May 22, 2003); <u>Franks Inv. Co., LLC v. Union Pac. R.R.</u>, 972 F. Supp. 2d 891, 897 (W.D. La. 2013); <u>First S. Farm Credit, ACA v. Gailliard Farms,</u>

Inc., 880 So. 2d 223, 225 (La. App. 2d Cir. 2004), cannot be construed to cover any of the Secret Project materials.

Accordingly, plaintiff's motion is denied as to the BP Secret Projects.

B.     The Fitzgerald Reports, the Operations Reports and the Clawed-Back Documents

Wisner asks the court to compel production of the reports that Dr. Fitzgerald co-authored for the Fourchon Beach Project during the early months of 2014 and the underlying data that he used.  BP argues that the Fitzgerald Reports are protected by the work product doctrine. Defendant asserts that the underlying data is either available publicly or that BP has already produced all of the non-public data to Wisner pursuant to the Access Agreement or during discovery in this matter.  Wisner also apparently seeks a ruling on whether certain documents that BP clawed back from an inadvertent production to plaintiff are protected from discovery.  BP responds that these documents are related to the Fitzgerald Reports and are similarly protected from disclosure by the work product doctrine.

BP provided to the court for in camera review an electronic drive containing the voluminous collection of Fitzgerald Reports, clawed back documents and Operations Reports, which are the finalized versions of the Fitzgerald Reports that were completed in February 2015.  Although Wisner disclaimed any interest in the Operations Reports, Record Doc. No. 124, my rulings concerning the Fitzgerald Reports apply equally to the

Operations Reports.  The clawed-back documents are listed only by Bates Numbers in a letter from defendant's counsel to plaintiff's counsel that is included as Exhibit 1 to Defendant's Exh. A, Hayward's declaration, without any description or privilege log that complies with Fed. R. Civ. P. 26(b)(5)(A)(ii).  Nonetheless, I have reviewed the clawed-back documents, and I find that all of them are e-mails, drafts, reports and data compilations related to preparation of the Fitzgerald Reports or Operations Reports.

Having reviewed the Fitzgerald Reports, Operations Reports, clawed-back documents, Hayward's declaration, Block's unredacted declaration and Exhibit 1 to his declaration (both of which are filed under seal), I find that the Fitzgerald Reports, Operations Reports and clawed-back documents are protected from discovery by the work product doctrine.  The Fitzgerald Reports were prepared at Block's direction in anticipation of litigation with Wisner and for eventual use at trial.

On December 11, 2013, Block sent his project initiation e-mail to Hayward, Wallace, Folse and two outside counsel, Jake Rodriguez and Christopher J. Esbrook (one of BP's counsel of record in the instant lawsuit).  The e-mail was marked as a privileged and confidential attorney-client communication and work product.  In it, Block stated specifically why litigation was anticipated and why the requested data compilations and evaluations were needed to assist in addressing expected challenges during litigation.  Exh. 1 (filed under seal) to Defendant's Exh. B, Block declaration.  Block's goals in initiating the Fourchon Beach Project were to educate attorneys who would represent BP

31

in anticipated and pending litigation; provide the basis on which to evaluate the merit and potential value of various claims; and gather and organize the material necessary to provide the basis for expert reports and opinions regarding that anticipated litigation. Defendant's Exh. B, Block declaration at ¶ 21.

Block's statements about pending and anticipated litigation are supported by the record.   As noted above, Wisner formally filed claims for breach of the Access Agreement and other alleged damages as a cross-claim against BP on April 19, 2011, in Civil Action No. 10-2771 in this court.  That case was consolidated with the Deepwater Horizon multi-district litigation.  MDL No. 2179, Record Doc. No. 326, ¶¶ 37-44, 56-60, 64-70, 72-73.  The breach of contract claims concerning the Access Agreement that Wisner asserted in the prior action were essentially the same as it asserts in this case. Plaintiff filed the instant case on July 1, 2014, so that its contract claims could be severed from and proceed independently of MDL No. 2179.

Contrary to plaintiff's argument, the evidence establishes that Dr. Fitzgerald was neither acting in the ordinary course of defendant's business of responding to the oil spill nor performing the same duties as he did before Hayward contacted him in December 2013 to work on the Fourchon Beach Project.  Merely because Dr. Fitzgerald was using his expertise and "writing reports" does not establish that he had the same duties or was working for the same purposes in preparing the Fitzgerald Reports as he did when he acted first as a SCAT Team Lead in 2010 or later as a SCAT Team Adviser.  The crucial

question is not what type of work he performed, but whether the primary motivating purpose of his work was to assist with pending or anticipated litigation.  No evidence has been presented establishing that the Fitzgerald Reports would have been created regardless of whether litigation was also expected to ensue, which might show that they were created in the ordinary course of business, rather than in anticipation of litigation. Total E & P USA, Inc. v. Kerr-McGee Oil & Gas Corp., No. 09-6644, 2014 WL 4104192, at *6 (E.D. La. Aug. 19, 2014) (citing Global Oil Tools, 2013 WL 1344622, at *6).

In-house counsel Block asked Hayward to organize the Fourchon Beach Project and approved the selection of Dr. Fitzgerald.  Hayward and Dr. Fitzgerald understood that all work done on the project was to be conducted and maintained separately and confidentially from any other work done on the spill response, with reporting only to Hayward and Block.  No field work or additional data gathering was conducted to generate these reports.  Dr. Fitzgerald understood at the time that the purpose of this work was to educate lawyers representing BP in future litigation, that Wisner and BP were already involved in a lawsuit and that the reports would be provided to BP's current attorneys.  The work product doctrine protects the work of non-attorneys like Dr. Fitzgerald and his co-authors in compiling, organizing and evaluating data at the direction of and for use by Block and other attorneys in connection with pending or anticipated litigation. Upjohn, 449 U.S. at 686-88; Nobles, 422 U.S. at 238-39; In re Int'l

Sys. & Control Corp., 693 F.2d at 1238; Clopton, 2014 WL 6964537, at *2; LaSalle Bank N.A., 2004 WL 902169, at *6.

While the underlying facts are discoverable, the Fitzgerald Reports do not lose their status as work product merely because they contain factual information.  Mack v. GlobalSantaFe Drilling Co., No. 04-3461, 2006 WL 980746, at *1 (E.D. La. Apr. 11, 2006); High Tech Comm., Inc. v. Panasonic Co., No. 94-1477, 1995 WL 45847, at *6 (E.D. La. Feb. 2, 1995) (citing In re Int'l Sys. & Control Corp., 693 F.2d at 1240). Wisner was able to explore the facts within Dr. Fitzgerald's knowledge during his deposition.  Plaintiff is not entitled to the benefit of Dr. Fitzgerald's documentary work in compiling, organizing and analyzing the data for BP's attorneys in anticipation of litigation unless Wisner can meet its own evidentiary burden to overcome the work product protection.

BP has established that the Fitzgerald Reports and clawed-back documents are protected work product.  Thus, the burden shifts to Wisner to show that it has substantial need for the materials to prepare its case and that it cannot, without undue hardship, obtain the substantial equivalent of the materials by other means.  Fed. R. Civ. P. 26(b)(3).  Wisner fails to satisfy this burden.

First, Wisner has produced nothing to rebut BP's evidence that the data underlying the Fitzgerald Reports is both Unified Command data generated during the oil spill response and publicly available data; that no field work or additional data gathering was

conducted to generate the reports; and that BP has provided Wisner with all of the non-public data underlying these reports pursuant to the Access Agreement and in discovery. Accordingly, Wisner has neither shown a substantial need for the underlying data nor that it cannot obtain the substantial equivalent of the publicly available data from other sources. Wisner has not demonstrated a substantial need for Dr. Fitzgerald's analysis, when it can engage its own experts to evaluate the data to which it has access.

Second, Wisner has offered only speculation that the Fitzgerald Reports formed a basis of the report that BP submitted to the Federal On-Scene Coordinator in April 2014, after which the Federal On-Scene Coordinator declared cleanup complete on Wisner's property in reliance on that report. Wisner speculates that the Fitzgerald Reports conflict with the report delivered to the Federal On-Scene Coordinator and that BP misrepresented the condition of the Wisner Property to the Federal On-Scene Coordinator, then used the Federal On-Scene Coordinator's declaration that the cleanup was complete to cancel the Access Agreement in May 2014. Although Wisner submitted some deposition evidence with its reply memorandum that allegedly supports its theory, the evidence does not in any way implicate the Fitzgerald Reports nor does it lead to the inferences that Wisner suggests. Wisner cannot establish a substantial need for the Fitzgerald Reports based on pure speculation.

In addition, as the court has previously held, BP did not need plaintiff's input or consent to cancel the Access Agreement because it was "terminable at will by either

party. . . .  [BP's May 2014] notice of termination could not be a breach of the contract."

In re Oil Spill by the Oil Rig Deepwater Horizon, 2014 WL 4693068, at *11.  Wisner has

not shown substantial need for the Fitzgerald Reports to support its contention that BP

improperly terminated the Access Agreement.

Finally, Wisner's references in its reply memorandum to the crime/fraud exception

that may vitiate attorney-client privilege and/or work product protection under certain

circumstances are wildly speculative and wholly unsupported by any evidence.  One of

the cases that Wisner cites notes that, "[i]n matters referring to fraud or crime generally

we have required that the party seeking discovery must make a prima facie showing of

fraud or crime."  Haines v. Liggett Grp. Inc., 975 F.2d 81, 95 (3d Cir. 1992) (citing In re

Impounded Case (Law Firm), 879 F.2d 1211, 1214 (3d Cir. 1989); In re Grand Jury

Proceedings (FMC), 604 F.2d 798, 802 (3d Cir. 1979)).  The Fifth Circuit has held that

a prima facie case of fraud or crime requires "[evidence] [s]uch as will suffice until

contradicted and overcome by other evidence . . . . [a] case which has proceeded upon

sufficient proof to that stage where it will support [a] finding if evidence to the contrary

is disregarded."  In re Int'l Sys. & Controls Corp., 693 F.2d at 1242 (brackets in original)

(emphasis added).  No such prima facie showing has been made here.  Like the Fifth

Circuit in <u>In re Int'l Sys. & Controls Corp.</u>, I "find nothing in the record, however, of fraud except the plaintiff's <u>allegations</u>." <u>Id.</u>

Accordingly, plaintiff's motion to compel production of the Fitzgerald Reports and the clawed-back materials is also denied.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's Second Motion to Compel is denied in its entirety.

New Orleans, Louisiana, this _____13th_____ day of November, 2015.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE